**Wayne and Arlene SELDEN, Appellants,**

v.

**William BURNETT, and W.M. Burnett and Associates, Appellees.**

**No. S–2194.**

Supreme Court of Alaska.

April 22, 1988.

---

Joe P. Josephson, of counsel, Robert A. Breeze & Assoc., P.C., Anchorage, for appellants.

Sigurd E. Murphy and Joseph R.D. Loescher, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Wayne and Arlene Selden unwittingly invested in a scam. The company that offered the investment and perpetrated the scam is now bankrupt. Consequently, the Seldens sought to recover from William Burnett, an accountant. Burnett had recommended the investment to several of his clients, who evidently communicated his recommendation to the Seldens. The Seldens were not Burnett's clients.

The superior court granted summary judgment to Burnett on the ground that he had no relationship with the Seldens. The Seldens appeal, arguing that they did have a relationship with Burnett such that Burnett owed them a duty of care and conceivably could be liable for negligent advice.

We are presented with two issues: (1) What relationship is necessary between an accountant and a non-client, for the accountant to be liable for negligent advice obtained indirectly by the non-client? (2) Did Burnett lack such a relationship with the Seldens?

I.

A. *Facts*

Mr. Heppner, the president of Competition Aircraft, came to Alaska in 1981 to attract investors into an aircraft sale-and-leaseback tax shelter. He would arrange for interested investors to purchase planes, which he would take care of leasing to aviation companies in Seattle. The purchase of a plane could result in a large investment tax credit, lowering the investor's taxes. It appears that Competition Aircraft originally sold bona fide aircraft, but at some point began selling non-existent ones.[1]

Burnett, a Kenai accountant, first found out about Competition Aircraft in 1982 from a former tax client, Kenai police officer Kalar. While Kalar strongly encouraged Burnett to invest, Burnett was not interested initially. Later in the year, at

---

1. This ultimately resulted in an FBI investigation and a federal indictment against Heppner and his wife. As for the tax consequences, the IRS ruled that those investors that purchased real aircraft had a sound tax shelter, while those that purchased non-existent aircraft did not.

Kalar's insistence, Burnett agreed to a meeting with Heppner. Burnett subsequently inquired about Competition Aircraft with the Seattle Better Business Bureau, Dun & Bradstreet, the IRS, and the manufacturer of the type of aircraft sold by Competition. Finally, in November of 1982, Burnett personally bought a plane through Competition Aircraft. He also visited Competition Aircraft's facility at Boeing Field to view their operation.

Shortly thereafter, Burnett recommended to some of his tax clients that they invest in Competition Aircraft's sale-and-leaseback program. A few of those clients were Alaska State Troopers, as was Mr. Selden. A number of the troopers, both clients and non-clients of Burnett, had frequent conversations about Burnett's advice and about the Competition Aircraft scheme. The precise manner in which Burnett's advice was passed to Selden is spelled out in the affidavits of troopers Kallus, Kirkpatrick, and Selden himself, summarized as follows:

Kallus was a tax client of Burnett. Burnett recommended the Competition Aircraft program to him. Kallus believed Burnett recognized that troopers shared common tax problems. Burnett told Kallus that he had recommended the Competition Aircraft program to other law enforcement personnel. Kallus spoke to Selden about "the tax advantages alleged to be associated with the program, and about Mr. Burnett's enthusiasm for the program."

Kirkpatrick was not a regular tax client of Burnett. He got Burnett's name from Heppner, the president of Competition Aircraft. Kirkpatrick said that he also got Burnett's name from Selden. Kirkpatrick had a meeting with Burnett, at which he told Burnett that "Mr. Selden was a fellow trooper who was interested in the Competition Aircraft, Inc., tax shelter program and who had talked with Mr. Heppner, as I had done, and that Mr. Selden understood Mr. Burnett was familiar with the program and its tax benefits." After reviewing Kirkpatrick's tax records, Burnett recommended the program to him. The following day, Kirkpatrick spoke to Selden about the program, and about the advice given by Burnett.

Kirkpatrick did not invest. Both the Kalluses and Seldens did. Unfortunately, it appears that they purchased non-existent planes.

A meeting of 40 or 50 disgruntled investors was held in the spring of 1985, perhaps two years after the Seldens purchased the non-existent aircraft. Burnett stated in his affidavit that he "did not provide any tax advice at that meeting to the Seldens or anyone else." However, Kallus and Selden recall that Burnett reassured the group that the "tax gig" was basically sound, and cautioned against overreacting. The evidence does not show in what capacity Burnett attended the meeting, or whether he made a formal presentation as opposed to off-the-cuff remarks.

## B. *Proceedings*

The Seldens, along with Mr. and Mrs. Kallus, are the plaintiffs in this action. Both couples allege that Burnett negligently gave them tax advice.

Burnett moved for summary judgment against the Seldens. In his memorandum in support of the motion, Burnett stressed that the Seldens never sought or received tax advice from him. He also pointed out that tax advice is "individually tailored to each client's needs, [and that he] does not expect his clients to pass on his recommendations to other individuals."

Judge Karen Hunt granted Burnett's motion for summary judgment, stating in part:

[B]efore there can be liability for negligent misrepresentation, there must be a relationship between the parties that provides a basis for the plaintiff to rely upon the defendant for information, and which imposes upon the defendant a duty to give the information with care. *Howarth v. Pfeifer*, 443 P.2d 39, 43 (Alaska 1968).... The facts of this case illustrate that there was no relationship between the Seldens and the defendants.... [T]his Court concludes that defendants did not owe a duty to the Seldens as a matter of law.

## II.

A negligence action can exist only if the defendant owed the plaintiff a duty of care. *Stephens v. State, Dep't of Revenue,* 746 P.2d 908, 910 (Alaska 1987). "Duty" has been defined as the "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." W. Prosser, *The Law of Torts* § 53 at 325–26 (4th ed. 1971), *quoted in Stephens,* 746 P.2d at 910.

In *Howarth v. Pfeifer,* 443 P.2d 39, 43 (Alaska 1968) (footnote omitted),[2] we stated that before there can be liability for negligent misrepresentation,

> there must be a relationship between the parties, whether growing out of contract or otherwise, such that in morals and good conscience the plaintiff has the right to rely upon the defendant for information, and the latter owes a duty to give the information with care.

We now address what kind of relationship is necessary to subject an accountant to a duty of care toward a non-client who received the accountant's advice secondhand as a tip.

■ The Seldens' attorneys discuss many cases supporting an expansive duty of care on the part of accountants.[3] However, those cases all involve the public role of accountants in preparing and certifying financial statements. A single set of financial statements may routinely be relied upon in a variety of transactions by lenders, trade creditors, shareholders, investors, market analysts, and governmental agencies. *See* Restatement (Second) of Torts § 552 comment h, illustration 10 (1977). It is in that context that courts have broadly extended accountants' duty of care to include unknown plaintiffs. We do not find those cases helpful here. When an accountant gives personal tax advice, he acts in a private capacity. We believe that a more limited duty of care in the context of this case is not at all inconsistent with expansive liability for accountants acting in their public capacity.

■ We hold that when an accountant in the course of giving personal tax advice verbally recommends a particular investment to a client, the accountant owes a duty of care to third parties only if the accountant specifically intends the third parties to invest relying on his advice, and only if he makes his intent known. Thus, if an accountant were to give investment advice to the representative of a group of investors, explicitly intending the information to be for the benefit and guidance of each member of the group, the accountant would owe a duty of care to each member.[4] However, the accountant would owe no duty to non-members to whom the information might subsequently be relayed.[5] Under this rule, a non-client who obtains personal investment advice secondhand will rarely be entitled to damages from the

---

**2.** In the *Howarth* case, a seller of real property was told by his insurer prior to the transfer of title that the purchaser had obtained insurance on the property. Consequently, the seller cancelled his own policy. In fact, the contract purchaser had not yet obtained insurance. The building burned down while it was uninsured, leading the seller to seek damages for the misrepresentation made by his insurer. This court held that insurers have a duty to speak with care "because of the foreseeability of pecuniary harm if they speak without reasonable care." 443 P.2d at 42. This duty did not depend on privity of contract. Instead, it depended on a relationship between the parties. *Id.* at 43. This court reached the same result in the analogous cases of *Bevins v. Ballard,* 655 P.2d 757 (Alaska 1982) and *Transamerica Title Ins. Co. v. Ramsey,* 507 P.2d 492 (Alaska 1973). All three cases involved the direct and purposeful transmittal of information from defendant to plaintiff.

**3.** *See, e.g., Hochfelder v. Ernst & Ernst,* 503 F.2d 1100 (7th Cir.1974); *Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85 (D.R.I.1968).

**4.** Similarly, an accountant who gives advice to a married person intends it to be used by the married couple, insofar as his advice pertains to investment of their joint assets. Thus, Burnett owed Mrs. Kallus a duty of care.

**5.** We recognize that there is a fine line between intending a third party to rely on advice and knowing or believing that a third party might rely on it. However, broadening the rule so that liability is cut off at some other point would only shift the boundary problem, rather than eliminate it.

accountant who provided the advice.[6] Our reasons for the rule are as follows:

First, an accountant reaps no benefit when his advice is passed to a non-client who invests in reliance on it. A more expansive rule of liability would put accountants in the no-win position of being responsible for advice for which they receive no compensation by non-clients, and upon which they never intend the non-clients to rely. Nor is such third-party investment a necessary or inevitable incident of the business, requiring, for the sake of fairness, the accountant to internalize all ensuing harm. Thus, this situation is quite different from products liability. A manufacturer's duty of care is broad, because products necessarily and inevitably get transmitted from manufacturer to retailer to consumer. Furthermore, product consumers are often powerless to protect themselves from injury.[7]

Second, although malpractice insurance might cover the accountant's liability, to allow a non-client to recover would be to spread the loss to the wrong group—namely, the group of fee-paying clients on whom the burden of insurance premiums ultimately falls.

Third, there is great risk that the accountant's verbal advice will not be accurately transmitted from client to non-client. Because of this inherent uncertainty, it is unreasonable for a non-client investor to place undue reliance on such a secondhand tip. Consequently, there is little societal expectation of compensation for damages caused by reliance on such tips, regardless of whether it can be proved that a tip was accurately transmitted in a particular case.

Fourth, a rule of more expansive liability would be difficult to contain. If we were to adopt a broader rule—for example, that an accountant is liable to a non-client to whom he *knows* the recipient intends to relay the investment advice—clients could unilaterally increase their accountants' liability exposure simply by stating that certain other people would receive the information. The accountancy profession could respond to such a rule by either raising rates or asking for indemnity agreements or disclaimers from every paying client. However, we see little reason to require them to do so.

The rule we have adopted today may be somewhat different from the approach in section 552 of the Restatement (Second) of Torts. Section 552 provides, in part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Subsections (1) and (2) of section 552 seem somewhat inconsistent to us. We read subsection (1) to impose liability only when the provider of information supplies it for the guidance of the injured party. This would require intent. However, subsection (2) purports to *limit* the liability of subsection (1) to persons to whom the provider intended to supply information or knew that the recipient intended to relay it. This limitation of the rule can easily be read to be broader than the rule itself.

**6.** Our holding today has no bearing on claims of intentional, rather than negligent, misrepresentation.

**7.** *See Swenson Trucking & Excavating, Inc. v. Truckweld Equipment Co.,* 604 P.2d 1113, 1116 (1980), *appeal after remand,* 649 P.2d 234 (Alaska 1982).

This ambiguity is replicated in the comments, which state:

> The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied....
>
> ... It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons, or group.

Restatement (Second) of Torts § 552 comment h (1977). The first sentence quoted above seems to indicate that liability must be predicated by intent, while the second sentence indicates that mere knowledge may be sufficient.

Subsections (1) and (2) of section 552 appear to offer a uniform rule for liability—a compromise position—that does not distinguish between the public and private capacities of accountants. We find it helpful to recognize such a distinction, because it reflects a difference in societal attitudes and expectations in the two different contexts. Thus, we do not adopt section 552 to the extent it is inconsistent with the rule we decided upon in this case.

### III.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact...." Alaska R.Civ.P. 56(c). Furthermore, "[a]ll reasonable inferences of fact from proferred materials must be drawn against ... the moving party, and in favor of ... the non-moving party." *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985). We review summary judgments *de novo*. *State v. Jennings*, 555 P.2d 248, 250 (Alaska 1976).

It is a question of fact whether Burnett intended the Seldens to invest in the Competition Aircraft tax shelter scheme in reliance on Burnett's advice to Mr. Kallus and others. However, this question is not put into issue by the affidavits in the appellate record.[8] The affidavits contain only a single allegation that Burnett had any awareness of, or relationship with, the Seldens prior to their investment: Trooper Kirkpatrick, upon meeting with Burnett, told him that "Mr. Selden was a fellow trooper who was interested in the Competition Aircraft, Inc., tax shelter program and who had talked with Mr. Heppner, as I had done, and that Mr. Selden understood Mr. Burnett was familiar with the program and its tax benefits."

Looking at the affidavits in the light most favorable to the Seldens, we might infer that Burnett ought to have known, or even did know, that the Seldens would invest in reliance on his advice. We also might infer that Burnett hoped his paying clients would pass his name on to others. However, the affidavits do not show that Burnett *intended* the Seldens to invest on their own in the Competition Aircraft scheme. Moreover, such an intent would have been unlikely. Presumably, Burnett gave advice for the purpose of making a living. His interest, if any, in non-clients such as the Seldens was to encourage them to become fee-paying clients, not to invest on their own.[9]

We AFFIRM the summary judgment.

BURKE, J., not participating.

---

**8.** In the complaint, the Seldens allege that they "employed the professional services of the Defendant as a Public Accountant to give Plaintiffs professional income tax related advice." However, in the Seldens' memorandum in opposition to Burnett's summary judgment motion, they state: "Defendants assert correctly that Wayne and Arlene Selden were not tax clients of defendants." We assume the allegation in the complaint was simply a mistake.

**9.** The Seldens also argue that Burnett's liability could be based on his comments at the 1985 meeting of disgruntled investors. We find no merit in this claim. The Seldens purchased the non-existent airplane in 1983. The affidavits

**L.L.M., Appellant,**

**v.**

**P.M., Appellee.**

**No. S–1901.**

Supreme Court of Alaska.

May 13, 1988.

give no indication that the Seldens' damages were caused or compounded by Burnett's com-