762 A.2d 582

**WALPERT, SMULLIAN & BLUMENTHAL, P.A.**

**v.**

**George KATZ, et al.**

**No. 50, Sept. Term, 1998.**

Court of Appeals of Maryland.

Nov. 21, 2000.

Kathleen A. Birrane, James P. Ulwick, (Kramon & Graham, P.A., on the brief), Baltimore, for petitioner.

Ronald E. D'Anna (Steven G. Schwartz, Mattlin & McClosky, on the brief), Boca Raton, FL, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* CHASANOW,** RAKER, WILNER and CATHELL, JJ.

BELL, Chief Judge.

This case presents the issue of under what circumstances, if any, absent a contractual relationship, an accountant is liable for the economic losses of a party who relied on a financial report which the accountant prepared. The Circuit Court for Baltimore City concluded that, under the circumstances of this case—where there is no privity between the accountant and plaintiff and the plaintiff is not the intended beneficiary of the

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

** Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

accountant's contract—no duty is owed. Although agreeing with the trial court that the plaintiffs were not the intended beneficiaries, the Court of Special Appeals nevertheless reversed the judgment of the Circuit Court. It held, in an unreported opinion, that there was sufficient evidence from which a trier of fact could find that, under the circumstances, a duty was owed to the plaintiffs. This Court granted the petitioner's Petition for Writ of Certiorari in order to review this matter of first impression. We agree with the intermediate appellate court and, accordingly, affirm.

## I.

The respondents, George and Shirley Katz (the "Katzses"), filed suit in the Circuit Court for Baltimore City against Walpert, Smullian & Blumenthal, P.A. ("WS & B"), the petitioner accountants, seeking damages for negligence, gross negligence, negligent misrepresentation and breach of contract, as a consequence of loans they made to Magnetics, Inc., George Katz's former company and the petitioner's client. The complaint alleged that George Katz was the owner and president of Magnetics, a printing supplies and press repair business, until 1987 when, as a result of failing health, he retired as both owner and operator. At that time, George Katz relinquished both his ownership interest in the company to his wife, Shirley, and their two sons, giving each a one third interest, and passed control of the company to his son, Philip. Although he continued to be listed on the books as president, George Katz neither attended meetings of the board of directors nor participated in the day-to-day management of the company. In 1989, George Katz's health further deteriorated.

The Katzses remained financially interested in, and involved with, Magnetics after George Katz's retirement. George Katz received an annual salary of $5,000 and Mrs. Katz, now a one third owner, received $20,000 annually as a consulting fee. In addition, the Katzses received $120,000 a year as rental for the building out of which the business was operated.

Subsequent to George Katz's relinquishment of control of Magnetics, Philip Katz retained WS & B as Magnetics' accounting firm. WS & B's dual undertaking through its contract was to perform annual audits of Magnetics' financial statements as well as prepare unaudited reports for the company every six months. In the course of the engagement, it prepared unaudited compilations of Magnetics' financial statements for the periods ending: (1) April 30, 1989; (2) April 30, 1990; (3) April 30, 1991; and (4) April 30, 1992. Moreover, for those same years, WS & B audited Magnetics' annual year-end financial statements. Additionally, as part of the contractual services provided to Magnetics, WS & B prepared personal income tax returns for the Katzses from 1988 through 1992, and prepared an estate plan in 1990.

Also subsequent to his retirement, George Katz and his wife entered into four financial transactions with Magnetics. In 1990, they loaned Magnetics $425,000 and then in 1992, they pledged $150,000 to Magnetics, executed a limited payment guarantee of $1,000,000 to Magnetics and also signed an indemnity deed of trust and security agreement securing a debt previously incurred by Magnetics.

After a June, 1993 independent audit found that reported inventory and accounts receivable had been inflated by Magnetics, the Bank of Baltimore, Magnetics' principal lender, called its $2 million loan. As a result, Magnetics was forced to cease operations, and the Bank of Baltimore took possession of the company's premises and liquidated its assets.

The Katzses thereafter sued WS & B for the losses they suffered as a result of the accounting error that caused Magnetics' collapse.[1] WS & B moved for summary

---

1. According to the Katzses, as a result of a mathematical error, which went undetected for years, WS & B overstated the accounts receivable. The effect of the error was the overstating of inventory by approximately 10 times. The Katzses claimed further that WS & B failed to obtain, as it should have, independent confirmation of the receivables from the creditors, separate and apart from the input of the owners of the company.

judgment,[2] arguing that the respondents could not establish that WS & B owed them a duty, that any act of negligence on WS & B's part caused injury to them, or that the respondents changed their position to their detriment in reliance on financial statements prepared by WS & B. Central to its argument was WS & B's assertion that no duty ran to the respondents from its contract with Magnetics for the performance and preparation of audits and reports. In support of its summary judgment motion, WS & B submitted the affidavit of Patrick M. Tracy, which stated that WS & B was not asked to express an opinion on the advisability of the respondents or anyone else lending money to Magnetics, nor did it express an opinion as to whether the respondents should secure Magnetics' debt. Furthermore, WS & B argued that the respondents were not, and could not show that they were, third party beneficiaries to the contract between Magnetics and WS & B.

In response, the respondents proffered, via the affidavit of George Katz, the relationship between the respondents and WS & B, emphasizing the meetings they had prior to the

---

Contrary to the Katzses, WS & B maintained that the Katzses' damages were the result of a fraudulent financing scheme perpetrated by Philip Katz. It points out that Philip Katz served a two year sentence in the federal penitentiary for that scheme.

2. Maryland Rule 2–501 governs summary judgment practice in this State. Section 2–501(e) provides:

"The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to summary judgment as a matter of law."

Summary judgment is not a substitute for trial. Its purpose is not to try the case or resolve factual disputes, but to determine whether a factual controversy exists requiring a trial. See *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 205–06, 680 A.2d 1067, 1077 (1996). The determination of whether a genuine dispute of material fact exists and, if not, what the ruling of law should be, requires the reviewing court to resolve all inferences to be drawn from the pleadings, admissions, and affidavits, etc. against the moving party. In making that determination, even when the underlying facts are undisputed, all inferences must be drawn against the moving party. See *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 145, 642 A.2d 219, 224 (1994).

respondents' making the loans to, and securing the debt for, Magnetics. Their opposition essentially stressed that George Katz had several meetings with WS & B personnel to look over the audits and reports of Magnetics prior to making loans to, or securing loans for, Magnetics, and that WS & B personnel knew that the Katzses had relied on information supplied by WS & B in deciding to lend monies to, or to secure loans for, Magnetics. As summarized by the Court of Special Appeals, the affidavit, relating to the $425,000 loan, set forth the following:

"According to Mr. Katz, '[i]n connection with the $425,000.00 loan, sometime between November 1, 1989 and February 1, 1990, Phillip Katz, Mr. Tracey and I met face to face in Mr. Tracey's office at Walpert, Smullian & Blumenthal for the express purpose of discussing the abovementioned loan.' Mr. Katz continued:

'The purpose in meeting with Mr. Tracey was for me to determine if it was advisable to make that [$425,000] loan to Magnetics based upon the then-existing financial condition as that related to its ability to repay the loan in accordance with the loan terms. . . .

'During that meeting, Mr. Tracey had presented Magnetics, Inc. a cash flow analysis and a projected profit and loss statement for the coming year based on the anticipated cash flow and sales.' "

"Mr. Katz further stated, '[i]n connection with my loan analysis, Mr. Tracey provided me with a copy of the October 31, 19[89] Magnetics, Inc. audit. . . .' Mr Katz swore that, at the meeting with Mr. Tracey, 'I made the WS & B representatives aware that I would consider lending money to Magnetics, [but the loan] was dependent on Magnetics' financial condition and the information which WS & B provided him, which included WS & B financial reports prepared for Magnetics.' "

That knowledge, argued the respondents, was enough to trigger a duty of care to them from WS & B.

At the hearing on the motion for summary judgment, the respondents' counsel summarized:

"[The relationship between the parties is important,] based upon the meetings that George Katz had with Mr. Tracy and Julie Simermeyer [the accountant who performed much of the Magnetics audit work] prior to making the $450,000 loan and prior to making the $150,000 loan, and his review of the financial information that WS & B sent him [Mr. Katz] directly which included the mid-year reviews and the year-end audits, and his agreeing to further secure credit extensions based upon what in his view appeared to be a company whose financial posture had changed drastically since the time he controlled the company."

Agreeing with WS & B that "Maryland law requires strict privity or its equivalent[,] which is a direct relationship," and that the respondents were not the intended beneficiaries of the contract between Magnetics and WS & B, the trial court granted summary judgment in favor of WS & B. It concluded that there was no duty flowing from WS & B to the respondents:

"[W]e do not see the existence of a relationship that Maryland law recognizes between the accounting firm and [the respondents]. We do not see it in actuality, and we do not see any equivalent to it such that would allow [the respondents] to recover directly against this accounting firm for the demise of this business and the resultant losses experienced by [the respondents]."

The respondents timely noted an appeal to the Court of Special Appeals. That Court, as we have seen, in an unreported opinion, reversed the judgment of the trial court. While the intermediate appellate court concluded that the trial court appropriately applied the rules pertaining to summary judgment and correctly determined that the respondents were not third party beneficiaries to the contract between Magnetics and WS & B, it held that there were sufficient facts alleged by the respondents to generate a genuine dispute of material fact,

namely, whether, under Maryland tort law, WS & B owed the respondents a duty of care.

## II.

The petitioner argues that the judgment of the Court of Special Appeals should be reversed and that of the Circuit Court affirmed. It submits that, while the intermediate appellate court correctly held that privity or its equivalent must be proven to establish an accounting malpractice claim, it erred in accepting, as the legal equivalent of privity, an accountant's knowledge of a third-party's reliance on that accountant's work product. According to the petitioner, knowing that the plaintiff is relying on the accountant's work product is relevant only to establish that the harm that the plaintiff suffered was foreseeable—a factor which is relevant only where foreseeability is the test of liability and, because that is not the test in Maryland, which requires an intimate nexus between the parties, it is simply not relevant. As the petitioner sees it, the relationship that falls short of privity, but is its equivalent, can be analogized to, and is co-extensive with, the third-party beneficiary doctrine.

Noting that three standards of third party liability have evolved with respect to accountant malpractice, *i.e.*, what it characterizes as the majority view,[3] the privity standard, first articulated in *Ultramares Corporation v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931); the more liberal foreseeability standard, see Restatement (Second) of Torts § 522;[4] and the

---

**3.** As we shall see, this approach is not the majority approach.

**4.** Restatement (Second) of Torts § 522, dealing with negligently supplying information for the guidance of others, provides:

"(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"reasonably foreseeable" standard adopted by three States,[5] the petitioner contends that, in finding the equivalent of privity in this case, contrary to this Court's embrace of the privity standard, the Court of Special Appeals has adopted the foreseeability standard. This is so, it says, because the privity standard would allow a third party, not in privity, to recover for economic harm in only two instances: if the accountant engaged in fraud and if the third party was the known and intended beneficiary of the accountant's contractual undertaking. The petitioner relies on *Jacques v. First Nat'l Bank,* 307 Md. 527, 534–35, 515 A.2d 756, 759–60 (1986) and *Flaherty v. Weinberg,* 303 Md. 116, 130–31, 492 A.2d 618, 625 (1985). As to the latter case, in which we held that, in the context of an attorney malpractice case, the scope of duty in negligence actions may be analogized to the third party beneficiary concept, it asserts that there is no logical basis to distinguish between legal and accounting malpractice cases.

The petitioner also relies on its contract with Magnetics, pointing out that it is an economic transaction which establishes and limits the liability of the attendant parties. Recognizing the logic, in the context of physical harm, of allowing a third party to avoid contractual limitations, it argues that, in the context of an economic harm, there is no such logical basis. In that situation, in addition to affording the third party greater rights than a party to the contract, the petitioner maintains, expanding third party rights beyond those of a

---

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered:
    '(a) by the person or one of a limited group or persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it;  and
    '(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."
See also *Bily v. Arthur Young & Company,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745 (1992).

**5.** See *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138 (1983); *First Nat'l Bank v. Crawford,* 182 W.Va. 107, 386 S.E.2d 310 (1989); *Citizens State Bank v. Timm, Schmidt & Co.,* 113 Wis.2d 376, 335 N.W.2d 361 (1983).

third party beneficiary fails to take into account the ability of a third party to avoid the injury. In the present case, the petitioner asserts, the Katzses could have protected themselves by retaining an independent accountant.

## III.

In Maryland, in order to establish a cause of action for negligence, a plaintiff must prove: a duty owed to the plaintiff or to a class of which the plaintiff is a part; a breach of that duty; a causal relationship between the breach and the harm; and damages suffered. *See Jacques v. First Nat'l Bank*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986); *Cramer v. Housing Opportunities Comm'n*, 304 Md. 705, 712, 501 A.2d 35, 39 (1985); *Scott v. Watson*, 278 Md. 160, 165, 359 A.2d 548, 552 (1976); *Peroti v. Williams*, 258 Md. 663, 669, 267 A.2d 114, 118 (1970). Absent a duty of care, there can be no liability in negligence. *See West Va. Central v. Fuller*, 96 Md. 652, 666, 54 A. 669, 671–72 (1903). There, *id.* at 666, 54 A. at 671–72, we stated:

> "[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. . . . As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or fact, if there has been no breach of duty."

*See also Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 658, 741 A.2d 1099, 1109 (1999); *Jacques, supra*, 307 Md. at 532, 515 A.2d at 758; *Ashburn v. Anne Arundel County*, 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986); *Read Drug & Chem. Co. of Balto. City v. Colwill Constr. Co.*, 250 Md. 406, 412, 243 A.2d 548, 553 (1968); *Leonard v. Lee*, 191 Md. 426, 431, 62 A.2d 259, 261 (1948); *Pennsylvania Railroad Co. v. State*, 188 Md. 646, 655, 53 A.2d 562, 566 (1947); *Inmi–Etti v. Aluisi*, 63 Md.App. 293, 310, 492 A.2d 917, 925 (1985).

Negligent misrepresentation is one variety of a negligence action. *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 646, 679

A.2d 540, 546 (1996) (opining that, "[n]egligent misrepresentation is a form of negligence"). In recognizing negligent misrepresentation as a separate tort action from deceit and allowing recovery for its violation, this Court in *Virginia Dare Stores v. Schuman*, 175 Md. 287, 292, 1 A.2d 897, 899 (1938), described the tort as follows:

"[T]he action lies for negligent words, recovery being permitted where one relies on statements of another, negligently volunteering an erroneous opinion, intending that it be acted upon, and knowing that loss or injury are likely to follow if it is acted upon."

*See also Weisman v. Connors*, 312 Md. 428, 443, 540 A.2d 783, 790 (1988). This definition of the elements does not explicitly recognize duty as a required element. Nevertheless, the *Virginia Dare* court stated that the defendant owed the plaintiff, in that case, some duty.[6] *See* 175 Md. at 291, 1 A.2d at 899. Our more recent renditions of the elements of negligent misrepresentation contain the duty element, explicitly ascribing its inclusion to *Virginia Dare*. In *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336–37, 439 A.2d 534, 539 (1982), this Court stated:

"The principal elements of the tort of negligent misrepresentation, as formulated in *Virginia Dare* ... and subse-

---

**6.** In particular, the Court stated:

"[The] allegations are sufficient to place Schuman at the time of his injuries upon the premises of the defendant either as the employee of Queen City Window Cleaning Company prosecuting the work his employer sent him to do under direction of Pillar, the defendant's manager, or doing work upon the premises under the direction of the defendant's manager which was not contemplated by his employer, or that he was there as appellant's invitee, but it is clear that, regardless of whether the proof places him in the first, second or third of these classifications, appellant owed him some duty."

*Virginia Dare Stores v. Schuman*, 175 Md. 287, 291, 1 A.2d 897, 899 (1938). *Virginia Dare* involved personal injuries and, for a time, the cause of action lay only when there were personal injuries involved. *See Holt v. Kolker*, 189 Md. 636, 639, 57 A.2d 287, 288 (1948). That restriction has not applied since the decision in *Brack v. Evans*, 230 Md. 548, 187 A.2d 880 (1963) (holding sufficient the negligence and fraudulent misrepresentation allegations in stock transaction).

quent cases decided by this Court, may be outlined as follows:

'(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

'(2) the defendant intends that his statement will be acted upon by the plaintiff;

'(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

'(4) the plaintiff, justifiably, takes action in reliance on the statement; and

'(5) the plaintiff suffers damage proximately caused by the defendant's negligence.' "

See also Gross v. Sussex Inc., 332 Md. 247, 259, 630 A.2d 1156, 1162 (1993); Weisman v. Connors, 312 Md. 428, 444, 540 A.2d 783, 791 (1988); Vance v. Vance, 286 Md. 490, 496, 408 A.2d 728, 731 (1979); St. Paul at Chase Corp. v. Manufacturers Life Ins. Co., 262 Md. 192, 216, 278 A.2d 12, 25–26 (1971); Chesapeake Homes, Inc. v. McGrath, et ux., 249 Md. 480, 488–89, 240 A.2d 245, 249–50 (1968); Brack v. Evans, 230 Md. 548, 552–53, 187 A.2d 880, 882–83 (1963); Piper v. Jenkins, 207 Md. 308, 313, 113 A.2d 919, 921 (1955); Holt v. Kolker, 189 Md. 636, 639, 57 A.2d 287, 288 (1948).

This Court extensively considered the duty element of negligence in Jacques. See id. at 532–37, 515 A.2d at 759–61. In that case, the issue was whether a bank that had agreed to process a loan application owed its customer a duty of care in the processing of that application. Duty, "an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another," id. at 532, 515 A.2d at 758, citing J. Dooley, Modern Tort Law, § 3.03 at 18–19 (1982, 1985 Cum.Supp.), we said, "has been defined as the expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." Id. at 533, 515 A.2d at 759, quoting Prosser and Keeton on The Law of Torts, § 53 at 357 (1984). The Court also acknowledged two major considerations affecting duty:

the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. *See id.* at 534, 515 A.2d at 759. With regard to the connection between the harm and the relationship between the parties, we observed:

"Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability."

307 Md. at 534–35, 515 A.2d at 759–60.

To assist it in determining whether the relationship between the bank and the Jacqueses met the 'intimate nexus' test and, thus, whether the bank owed the Jacqueses a duty of care, the Court reviewed, and then relied upon, *Ultramares Corporation v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931) and *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922). In *Glanzer,* the issue was whether a public weigher of beans, engaged and paid only by the seller, was liable to the buyer of the beans for negligence in the weighing. The Court of Appeals of New York held that the weigher was liable. The *Jacques* Court explained the rationale of the decision as follows:

"[T]he buyer, although having no contract with the weigher, was the known and intended beneficiary of the contract between the seller and the weigher, and therefore a beneficiary of the duty owed by the weigher. The court further concluded that as a public weigher holding itself out as skilled and careful in its calling, the defendant's 'assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed' thereby .... [g]iven the nature of the contract and the relation between the parties, the duty was one imposed by law as well as assumed by contract."

*Id.* at 535–36, 515 A.2d at 760, *quoting Glanzer*, 233 N.Y. at 239, 135 N.E. at 276.

*Ultramares* involved the negligence of public accountants in the preparation and certification of a balance sheet for a corporation. *Id.* at 173–74, 174 N.E. at 442. The accountants furnished thirty-two copies of the balance sheet to their client, who, as expected, displayed and passed them along to other businesses, including, among others, the plaintiff. *Id.* at 174, 174 N.E. at 442. The accountant was aware, in other words, that the certified balance sheet would likely be used by the client to secure financing. Relying on the misinformation contained in the balance sheet, the plaintiff made several financial advances to the accountant's client. When the client failed to pay its obligations, the plaintiff sued the accounting firm. While allowing recovery on the fraud claim, *id.* at 188, 174 N.E. at 448, the court held that the accountants were not liable in negligence to a third party who made loans to the corporation in reliance upon the balance sheet. *Id.* at 193, 174 N.E. at 450. We explained this decision, in *Jacques:*

"While noting that the accountants were generally on notice that the balance sheet was likely to be relied upon by others, the court distinguished this case from *Glanzer* on the basis that there was no 'contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants … to the indeterminate class of persons who … might deal with the [corporation] in reliance on the audit.' *Ultramares, supra*, at 446. In the absence of the intimate nexus found in *Glanzer*, the *Ultramares* court concluded that the accountants might be liable to the factor for deceit, but not for negligence alone."

*Jacques* at 536, 515 A.2d at 760.

The *Jacques* Court concluded:

"We discern from our review of the development of the law of tort duty that an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed-thus justifying the

imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty. Therefore, if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent."

*Id.* at 537, 515 A.2d at 761.

We first addressed whether a party could recover for economic loss only in a negligent misrepresentation action, in *Brack v. Evans*, 230 Md. 548, 187 A.2d 880 (1963). Although there was no extensive discussion of the nature of the relationship between the parties required to give rise to a duty of care, implicit in the decision was that the facts alleged were sufficient in that regard. In that case, the plaintiff, having read the announcement in the papers, called the defendant and spoke to one of its employees in order to place an order for as many of the shares of Upjohn at $45.00 or less per share, the price per share after the stock split the company intended, as $15,000 would buy. Having been advised that it would be a waste of time to take the order because the stock would be over-subscribed, the plaintiff accepted the defendant's recommendation that he purchase 10 shares of the old Upjohn common stock, then selling at $1,525.00 a share before the split. Realizing that the purchase of the old stock would result in his paying more for the stock, while receiving fewer shares, the plaintiff attempted to cancel the purchase a few minutes after the order was placed. In addition to being told that it was too late, the defendants informed him that he:

"[W]ould get dividends, rights and privileges from the Upjohn Co. only by purchasing the 'old' stock, which he would not get if he bought the 'new' stock and that the effect of the dividends, rights and privileges that the Plaintiff would get along with the purchase of the 'old' stock would make up the difference of the 89 shares aforesaid, amounting to approximately Four Thousand Dollars ($4,000.00) and that

the Plaintiff would be just as well off by purchasing the 'old' stock."

*Id.* at 552, 187 A.2d at 882.

Thereafter, the stock split and the new stock sold for $45.00 a share. The plaintiff subsequently received 250 shares of the new stock, not the old stock, and he never received any dividends or rights or privileges applicable to the old stock. The Court, in setting out the allegations, was careful to note that the plaintiff alleged "that [the defendants] held themselves out as consultants and experts in the field of securities, and that he relied entirely upon [their] recommendation and counsel ... and that the latter knew of this reliance...." *Id.* at 551, 187 A.2d at 882.

We next addressed the issue in *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982). It arose in the context of the sale of an automobile dealership. There, the owner of an automobile dealership, which the plaintiffs were in negotiations to purchase and which the plaintiffs intended to continue as an ongoing business, indicated, in response to the plaintiffs' inquiries as to the profitability of the dealership, that it was "mildly profitable," offering in support a handwritten trend sheet and stating that the audited statements of the dealership's operations were not complete or available. *Id.* at 332, 439 A.2d at 536. When, after the purchase, the plaintiffs learned that the dealership was operated at a loss, as reflected in audited statements prepared prior to the negotiations and sale, the plaintiff brought separate counts of breach of contract, deceit and negligent misrepresentation against the owner of the dealership. Having reviewed the facts alleged by the plaintiffs and traced the development of the tort of negligent misrepresentation from its first appearance in *Virginia Dare,* we reaffirmed its existence as a separate tort. *Martens,* at 336, 439 A.2d at 538. Once again, the Court did not engage in a lengthy discussion of duty; in fact, it essentially assumed that it existed.

In *Flaherty v. Weinberg,* 303 Md. 116, 492 A.2d 618 (1985), we focused more on the duty element, addressing it in the

context of an attorney malpractice action. There, the purchasers of real property brought an action for, *inter alia*, negligent misrepresentation against the settlement attorney who had been retained by, and represented only, the seller. *See id.* at 135, 492 A.2d at 627. We concluded:

"[W]e think it clear that Maryland, as a general rule, adheres to the strict privity rule in attorney malpractice cases. The sole exception that we have recognized to this rule is the third party beneficiary theory.[7] Although this exception is 'peculiarly applicable' to contract actions ... its scope has a broader range. In our view, the scope of duty concept in negligence actions may be analogized to the third party beneficiary concept in the context of attorney malpractice cases. Thus, to establish a duty owed by the attorney to the nonclient the latter must allege and prove that the intent of the client to benefit the nonclient was a direct purpose of the transaction or relationship. In this regard, the test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party."

*Id.* at 130–31, 492 A.2d at 625 (internal citation omitted). With respect to the third party beneficiary exception, which we indicated had a narrow scope, the Court commented:

"Properly applied, this exception will not expose the attorney to endless litigation brought by those who might conceivably derive some indirect benefit from the contractual performance of the attorney and his client. Moreover, this exception should have limited application in adversarial proceedings because our Code of Professional Responsibility requires that a lawyer represent his client zealously within the bounds of the law (Canon 7) and that the lawyer ordinarily not represent or act for conflicting interests in a transaction (Canon 5; EC 5–1, 5–14, 5–15, 5–19, 5–22; DR 5–105). *See also Clagett v. Dacy,* [47 Md.App. 23, 30, 420 A.2d 1285, 1290 (1980) ] (discussing professional responsibil-

---

**7.** The defendant-attorney in *Flaherty v. Weinberg,* 303 Md. 116, 492 A.2d 618 (1985) was also sued for professional malpractice.

ity of attorneys in context of attorney liability to third persons); 11:25 Md. Reg. 3–54 (containing Report of the Select Committee of the Court of Appeals of Maryland to Study the ABA Model Rules of Professional Conduct)." *Id.* at 131–32, 492 A.2d at 626. The *Flaherty* rationale thus seems to have limited applicability beyond the legal services, *i.e.*, attorney malpractice, context.[8]

---

8. In addition to the analysis set out above, the Court used language indicating that the holding was limited to the legal malpractice context: "Based on our review of the above cases, we think it clear that Maryland, as a general rule, adheres to the strict privity rule in *attorney malpractice cases.*" *Flaherty v. Weinberg,* 303 Md. at 130, 492 A.2d at 625 (emphasis added). Moreover, expressing the concern of the possible differing interests of the third party and the client if the attorney owes a duty to both the mortgagor and the mortgagee, we quoted then Judge Wilner, later Chief Judge of that court, writing for the Court of Special Appeals in *Clagett v. Dacy,* 47 Md.App. 23, 29, 420 A.2d 1285, 1289 (1980), who observed that "[a]ttorneys are not quite the free agents as some others are in the world of commerce. There are well-recognized limitations, judicially imposed and enforced, upon how they may conduct themselves, and who they may, and may not represent in certain situations." *Flaherty, supra* at 138, 492 A.2d at 629.

Our later cases confirm that the strict privity rule applies only in attorney malpractice cases. *See Noble v. Bruce,* 349 Md. 730, 744, 709 A.2d 1264, 1271 (1998); *Ferguson v. Cramer,* 349 Md. 760, 765, 709 A.2d 1279, 1282 (1998). In *Noble,* we held that non-client testamentary beneficiaries may not bring a malpractice action against an attorney for negligent estate planning advice allegedly given to the testator or for negligently drafting the testator's will. Discussing the privity requirement and noting that "[i]n attorney malpractice cases, Maryland generally adheres to the strict privity rule first explicated by this Court in *Wlodarek v. Thrift,* 178 Md. 453, 13 A.2d 774 (1940)," *Noble* at 738, 709 A.2d at 1268, the *Noble* Court observed that "although there may be a trend to relax or abandon the strict privity rule, a number of jurisdictions still retain the rule that, *in attorney malpractice* cases, absent fraud ..., an attorney is not liable to a non client for harm caused by the attorney's negligence in the drafting of a will or planning an estate." *Id.* at 740, 709 A.2d at 1269 (emphasis added). It went on, *id.* at 741–42, 709 A.2d at 1270, to consider the public policy concerns: "Application of the strict privity requirement in the will drafting or estate planning context has been justified by courts primarily on the following public policy grounds. First the rule protects the attorney's duty of loyalty to and effective advocacy for his or her client.... The strict privity rule protects an attorney's obligation to direct his or her full attention to the needs of the client. An attorney's preoccupation or concern with potential negligence claims by third parties might result in a diminution in the quality of the legal services received by

The next year, we decided another controversy involving the duty owed to a non-contracting party. In that case, *Council of Co–Owners v. Whiting–Turner,* 308 Md. 18, 23, 517 A.2d 336, 339 (1986), among the negligent acts alleged by the plaintiffs were negligent construction by the general contractor and the developer; negligent inspection by the developer and supervising architects, negligent supervision, and acceptance of the work by the design and supervising architects; negligent inspection by other architects and negligent obtaining of an occupancy permit by the developer. The plaintiffs also charged that architects employed to inspect the building and certify compliance, misrepresented "that the building was constructed pursuant to the approved building permit in accordance with the plans and specifications submitted with the original permit application and that the building was ready for occupancy." *Id.* at 23, 517 A.2d at 339. Additionally, they alleged that, in advertising and selling the units, the developer

---

the client as the attorney might weigh the client's interests against the attorney's fear of liability to a third party. Second, there exists the danger of placing conflicting duties on an attorney during the estate planning process if a non conflict is permitted to maintain a cause of action against a testator's attorney. As a result, an attorney's loyalty might become divided between the testator/client and the beneficiaries. Third, courts fear that absent the strict privity rule there would be no limit as to whom a lawyer would be obligated.... Furthermore, parties to a contract for legal services would loose control of their agreement if liability without privity were permitted. As one commentator noted, the strict privity rule has been retained in some jurisdictions because

'not only should an attorney know in advance who is being represented and for what purpose, but also the attorney should be able to control the scope of the representation and the risks to be accepted. Imposing liability in favor of non-clients, generally speaking, threatens those interests. In threatening the interests of the attorney, the interests of potential clients may also be compromised; they might not be able to obtain legal services as easily in situations where potential third party liability exists.' "

(internal citations omitted). In *Ferguson,* the Court addressed the issue "whether a beneficiary under a will may maintain a cause of action for professional malpractice against an attorney retained by the personal representative of the testator's estate." *Id.* at 762, 709 A.2d at 1280. Its statement of the policy reasons underlying the strict privity rule, *id.* at 771–73, 709 A.2d at 1284–86, supports the limited application of *Flaherty.*

negligently misrepresented "the building's suitability for occupancy." *Id.*

Acknowledging the general rule of liability where the result of negligence is the creation of a dangerous condition, the Court followed the modern trend, noting:

"[T]hat privity is not an absolute prerequisite to the existence of a tort duty. The duty of the architects and the builders in this case, to use due care in the design, inspection, and construction of this condominium extended to those persons foreseeably subjected to the risk of personal injury created, as here, by a latent and unreasonably dangerous condition resulting from their negligence."

*Id.* at 32, 517 A.2d at 343–44. Thus, we held that builders and architects owed a duty to purchasers of condominium units, who, though suffering only economic damages, were, as a result of the purchase, foreseeably subjected to the risk of personal injury because of the builders' or architects' negligence, and therefore:

"[T]he duty of builders and architects to use due care in the design, inspection, and construction of a building extends to those persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence. Additionally, we hold that where the dangerous condition is discovered before it results in injury, an action in negligence will lie for the recovery of the reasonable cost of correcting the condition."

*Id.* at 21, 517 A.2d at 338. With respect to the negligent misrepresentation counts, we said:

"The tort of negligent misrepresentation has been recognized in this State. *Flaherty v. Weinberg*, 303 Md. 116, 135, 492 A.2d 618 (1985); *Martens Chevrolet v. Seney*, 292 Md. 328, 439 A.2d 534 (1982). Because the allegations pertaining to this claim are for the most part stated in conclusory fashion, we have no way of knowing precisely what was said or written that Appellants believe constitute actionable misrepresentations. If the evidence discloses express representations made under circumstances that satisfy the ele-

ments of this cause of action as set forth in *Flaherty*, supra, 303 Md. at 135, 492 A.2d 618, the fact that Appellants have suffered only economic loss will not be a bar. However, if Appellants are contending that the warranties implied by law constitute representations that will support a cause of action if negligently made, the claim must fail. Although nonverbal conduct may under certain circumstances constitute a representation, we are not persuaded that an involuntary warranty existing solely by operation of law may constitute a representation that will support a cause of action for negligent misrepresentation."

*Id.* at 41–42, 517 A.2d at 348.

Another context in which this Court has discussed the nature of the relationship required to establish a duty of care, are cases in which economic damages only were incurred involving pre-contractual employment negotiations. That issue was presented in *Weisman v. Connors*, 312 Md. 428, 540 A.2d 783 (1988). The question in that case was whether a prospective employer owed a prospective employee a duty of care for statements made in an arm's length commercial transaction when there was no risk of physical injury. *Id.* at 441, 540 A.2d at 789. This Court, in defining the required relationship between the parties in that case, relied on the *Jacques* analysis of the 'intimate nexus' requirement and the two major considerations informing it—nature of the harm and the relationship between the parties, and *Martens*. As to *Martens*, we thought it significant for the proposition that "there may be the requisite special relationship or intimate nexus in an arm's length commercial transaction involving pecuniary loss only." *Weisman*, 312 Md. at 448, 540 A.2d at 792.

In addition, the Court relied on *International Products Co. v. Erie R. Co.*, 244 N.Y. 331, 155 N.E. 662 (1927), which was decided by the New York Court of Appeals between its decisions in *Glanzer* and *Ultramares*. There, knowing that the inquiry was made for insurance purposes, a bailee of goods negligently informed his bailor where the goods were stored and the court held him liable in negligent misrepresentation

for the resulting loss. On the question of duty, the New York court stated:

"Liability [for negligent misrepresentation] arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another."

*Id.* at 338, 155 N.E. at 664 (internal citation omitted).

Our analysis of the duty issue in *Weisman* is quite instructive. The plaintiff had a stable, high level job before entering into contract negotiations with the defendant with regard to leaving that employment for other employment with the defendant. In his complaint, the plaintiff alleged that the defendant made a number of representations leading the plaintiff to believe, among other things, that if he were to leave his present employment and join the company for which he was being recruited, he would be joining a stable company on the verge of a significant lateral expansion of its automotive division, that he would have an equity participation in this expansion and the value of which would more than offset the benefits he would lose by leaving his present employment. *See id.* at 432–33, 540 A.2d at 785. With respect to the significance of the negotiations and the representations, the Court opined:

"That Connors had a great stake in receiving accurate information from Weisman is readily apparent; conversely, Weisman had to realize that negligence on his part in conveying such information could result in considerable

economic harm to Connors. Of course, it was Weisman's objective to 'sell' Connors, prior to actual contract negotiations, on the wisdom of leaving his career employment at Ford and joining FWC. In this regard, the face-to-face precontractual discussions between Weisman and Connors more closely resemble the intimacy of the *Glanzer* parties than the remoteness of the *Ultramares* relationship. As in *Glanzer*, Weisman could reasonably foresee the probable consequences of negligence in his negotiations with Connors. And there was no question as in *Ultramares*, of 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'

"As we see it, nothing in *Jacques* mandates the conclusion, as a matter of law, that no special relationship or intimate nexus existed during the pre-contractual negotiations between Weisman and Connors which led to the execution of the employment contract. Undertaking to induce Connors to accept employment with FWC in the circumstances of this case may be likened to the sellers' representations in *Martens*, prior to entering into a contract of sale, that the distributorship would be profitable, as evidenced by the negligently prepared financial trend sheet. We cannot distinguish *Martens* on the ground suggested by Weisman, namely, that the special relationship found to exist between the parties in that case was because the seller affirmatively assumed the role of accountant in supplying financial information to the buyer. That such information is most often provided by accountants does not mean that the seller in *Martens* assumed the role of accountant. Indeed, the existence of a special relationship between the parties negotiating the type of high-level, long-term employment contract involved here—particularly where the parties will be working closely in succeeding years—is more plausible than between parties selling and buying an automobile distributorship, who may never see each other again."

*Id.* at 449–50, 540 A.2d at 793 (internal citations omitted).

In *Village of Cross Keys, Inc. v. U.S. Gypsum Co.*, 315 Md. 741, 556 A.2d 1126 (1989), this Court once again was faced

with the question of the extent of duty a manufacturer owed to a party with whom it had no contractual relationship. In that case, the developer and the architect of a building in the Village of Cross Keys filed an action against U.S. Gypsum for, among other causes of action, negligent misrepresentation. They alleged that they relied upon U.S. Gypsum's design for the construction of the exterior walls, and that the design and certain representations concerning it were faulty. *See id.* at 744, 556 A.2d at 1127. The misrepresentations on which the developer and architect relied were contained in a publication developed by U.S. Gypsum, setting specifications for the "USG Brick Veneer Curtain Wall System, including wind load limiting tables." *Id.* at 747, 556 A.2d at 1129. Among the defenses U.S. Gypsum offered was that it owed *no duty to either the* developer or the architect. *See id.* at 749–50, 556 A.2d at 1130. In that regard, it noted that it had no contract in connection with the Harper House project and that it had not designed a proprietary exterior wall system. *See id.* at 744, 556 A.2d at 1127.

Although acknowledging that "[the developer's and architect's] claim that a tort duty must be imposed upon one who has erred generates the specter of 'liability in an indeterminate amount for an indeterminate time to an indeterminate class,' a liability that concerned Justice Cardozo in *Ultramares Corporation v. Touche,* and continues to concern courts today," *Village of Cross Keys* at 744–45, 556 A.2d at 1127, the Court did not decide the issue, "leaving to another day the question of whether a manufacturer may, under certain circumstances, be responsible for negligent publication of information in this manner." *Id.* at 759, 556 A.2d at 1134. It did, however, express "grave doubts concerning the vitality of," *id.* at 758, 556 A.2d at 1134, U.S. Gypsum's argument that it "cannot be liable for its gratuitous publication to persons with whom USG had no dealings, but who were only a part of the 'general universe' or 'vast, faceless crowd of Sweet's Catalog users,'"[9] *id.* at 757, 556 A.2d at 1134, that there is no intimate

---

**9.** Sweet's Catalog, as the Court explained in *Village of Cross Keys v. U.S. Gypsum,* 315 Md. 741, 758 n. 6, 556 A.2d 1126, 1134 n. 6 (1989), is a

nexus between it and the developer and architect. *Id.* at 758, 556 A.2d at 1134. Having noted, in its analysis of the tort of negligent misrepresentation, the close interrelationship between the concept of duty and " 'justifiable' or 'reasonable' reliance by the parties suffering the loss," *id.* at 757, 556 A.2d at 1133, the Court explained:

"It is true that USG did not directly 'sell' this system or any component parts of it to the developer or to the architect. It did, however, develop a system under circumstances from which the trier of fact could find a specific intent that architects and perhaps engineers, builders, or developers would adopt it. The record discloses that the 805 and similar manufacturers' publications receive wide distribution in the trade by inclusion in Sweet's Catalog. Additionally, the 805 was directly available from USG or any of its sales staff. Although USG did not design the system for a fee from a particular client, or attempt to 'sell' it for direct compensation, it is safe to say it did not develop and publish these detailed drawings, specifications, and technical data tables for some altruistic motive. As one of a relatively few major manufacturers of the component parts of the system, it reasonably expected that acceptance and use of the system generally would translate into significant increased sales of its merchandise. It may reasonably be said, then, that the development and distribution of the 805 was for the purpose of earning a profit, albeit somewhat indirectly, and therefore publication was effected for USG's pecuniary interest.

"Although the group of persons who may be expected to rely upon information of this kind may be large, they are identifiable, particularly if the group is limited to architects and structural engineers. That their names cannot be known in advance is of no consequence. *Henley v. Prince George's County,* 305 Md. 320, 334–36, 503 A.2d 1333 (1986).

---

multi-volume work, published by McGraw–Hill of New York, containing brochures and folders for which the manufacturers pay a fee, and subscribers purchase.

A trier of fact could find that the architects and engineers are the very persons whom USG intended to act on the information supplied. We think it clear that in some circumstances it is the practice of the industry that architects and engineers depend upon technical information supplied by manufacturers. We doubt that the industry standard requires that each architect and engineer 'reinvent the wheel' for each project. Projected liability for error may be great when technical information is published under these circumstances, but apparently the potential for profits may also be great, and a decision of whether to publish in this fashion, and how much care to use in research, testing, conformation, proof reading, and the like may simply be business decisions."

*Id.* at 758–59, 556 A.2d at 1134.

## IV.

From the foregoing, the rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct, including negligent misrepresentations, resulting in economic damages emerges: to avoid "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares,* 255 N.Y. at 179, 174 N.E. at 444. Stated differently, the reason for the requirement is to limit the defendant's risk exposure to an actually foreseeable extent, thus permitting a defendant to control the risk to which the defendant is exposed. It was that concern that was being addressed by the *Jacques* Court when it juxtaposed *Glanzer* and *Ultramares* and stressed doubly that the Jacqueses were not strangers to the loan transaction and that the Bank promised the Jacqueses to process their loan application and to lock in a certain rate of interest for a period of time. *Jacques,* at 537, 515 A.2d at 761.[10] Concerning the promises,

---

**10.** In addition, the Court considered relevant to the resolution of the duty issue in *Jacques,* consistent with *Glanzer* and *Ultramares,* the public nature of the banking business. *Jacques,* 307 Md. at 541, 515 A.2d at 763.

the Court pointed out that they were an inducement to the Jacqueses and provided the Bank with a business advantage when the Jacqueses acted in conformance with them. *See id.* That same concern was the reason for the discussion, in *Weisman,* of the relationship between the pre-contractual job applicant and his prospective employer and drove the analysis of why, in *U.S. Gypsum,* the Court was not convinced that, under the circumstances there extant, U.S. Gypsum owed no duty to the developer and architect simply because it had no dealings with them.

### A.

We have contemplated and, indeed, commented, albeit obliquely and in a different context, on an accountant's duty to a non-contracting party with respect to negligent misrepresentation. In *Weisman, supra,* we noted, and rejected, the argument that the special relationship found to exist between the parties in *Martens* was because the seller affirmatively assumed the role of accountant in supplying financial information to the buyer, pointing out that the fact that such information is most often provided by accountants does not mean that the seller in that case assumed the role of accountant. *See Weisman,* 312 Md. at 444, 540 A.2d at 791. In *Jacques,* we observed, in connection with our discussion of "the nature of the business of the party upon whom the burden is sought to be imposed," 307 Md. at 541, 515 A.2d at 763, as a factor relevant to the determination of whether to recognize the existence of a tort duty,

> "[t]he law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants. Additionally, we have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill."

*Id., citing St. Paul at Chase v. Manufacturers Life Insur.,* 262 Md. 192, 219–20, 278 A.2d 12, *cert. denied,* 404 U.S. 857, 92

S.Ct. 104, 30 L.Ed.2d 98 (1971). We have not directly addressed the issue this case presents; it is a matter of first impression for this Court.

Courts that have faced the issue of accountant liability to a non-contracting third party have utilized different approaches. As the petitioner has pointed out, the courts have developed three basic approaches for determining the scope of accountants' liability to third parties who use and rely on their audit reports.[11] *See Scottish Heritable Trust v. Peat Marwick Main & Co.*, 81 F.3d 606, 611 (5th Cir.1996); *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 384, 11 Cal.Rptr.2d 51, 834 P.2d 745, 752 (1992). *See also* Orlinski, *An Accountant's Liability to Third Parties: Bily v. Arthur Young & Co*, 43 DePaul L.Rev. 859, 871–72 (1994). A significant number follow the *Ultramares* formulation, under which a third party will be denied relief for an auditor's negligence in the absence of a relationship with the auditor that constitutes privity or that is equivalent to privity. *See* Orlinski, *supra*, 43 DePaul L.Rev. at 871–72. The majority of jurisdictions, however, follow the Restatement approach: liability is imposed on suppliers of commercial information to third parties who are actually foreseen as the users of the information for a particular purpose. *Id.* The third view, followed by a few jurisdictions, allows third parties to recover for auditor negligence when their reliance on the audit report was reasonably foreseeable by the auditor. *See Rosenblum, Inc. v. Adler*, 93 N.J. 324, 461 A.2d 138 (1983).

The first approach, exemplified by *Ultramares*, requires, in order to be able to recover against an accountant for negligent misrepresentation, that the plaintiff and the accountant be in

---

**11.** Under traditional contract law, an accountant owed a duty exclusively to his client with whom he was in privity. *See* Orlinski, *An Accountant's Liability to Third Parties: Bily v. Arthur Young & Co.*, 43 DePaul L.Rev. 859, 871–72 (1994); Brian K. Kirby & Thomas L. Davis, *Accountant Liability: New Exposure for an Old Profession*, 36 San Diego L.Rev. 574 (1991). Some courts and commentators continue to favor a strict privity approach. This approach, the most narrow position taken with respect to accountant liability to third parties, is followed by only a few states. *See e.g., Ward v. Ernst & Young*, 246 Va. 317, 323–24, 435 S.E.2d 628, 631 (1993) (requiring privity).

privity or have a relationship equivalent to, or approaching, privity. *See Colonial Bank v. Ridley & Schweigert*, 551 So.2d 390, 394 (Ala.1989); *Idaho Bank & Trust Co. v. First Bancorp*, 115 Idaho 1082, 1084, 772 P.2d 720, 722 (1989); *Thayer v. Hicks*, 243 Mont. 138, 144, 793 P.2d 784, 788 (1990); *Citizens Nat'l Bank v. Kennedy & Coe*, 232 Neb. 477, 480, 441 N.W.2d 180 (1989).

Elucidating *Ultramares*, the Court of Appeals of New York reiterated the privity equivalent or near privity requirement in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110, 118 (1985), in the process, clarifying[12] the test of elements a plaintiff must establish: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking to that party or parties, which evinces the accountants' understanding of that party or parties' reliance. *Id.*

Two appeals were involved in *Credit Alliance*, in both of which the plaintiff loaned money to the accountant's client, in reliance on audited financial statements. There, no adequate allegation was present of a particular purpose for the preparation of the audit reports or any conduct on the part of the accountants indicating their relation to the plaintiff or indicating their knowledge of the plaintiff's reliance on the reports. *Id.* at 553, 483 N.E.2d at 119. On the other hand, in its

---

**12.** While the *Ultramares* court was clear in its statement of its position on the unfairness of imposing on the defendants an indeterminate liability, to an indeterminate class of people, for an indeterminate period of time, by contrasting the facts in that case with those in *Glanzer*, in which the third party was the "end and aim" of the transaction, there may have been created a false impression that its holding requires a contractual privity or that of a third party beneficiary. *Ultramares, supra*, 255 N.Y. at 182, 174 N.E. at 445. Certainly, *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985) and other subsequent cases make clear that *Ultramares* does not require strict privity or third party beneficiary status as a condition to third party suits against accountants.

complaint in *European Am. Bank & Trust Co. v. Strauhs & Kaye*, 477 N.Y.S.2d 146, 102 A.D.2d 776 (1984), the plaintiff contended that the auditor knew that the plaintiff was lending money to the client and that the auditor had communicated directly with the plaintiff in regard to the financial statements. *See Credit Alliance* at 554, 483 N.E.2d at 120.

The policy objective underlying the *Ultramares'* approach is the same policy reflected in our cases involving negligence claims brought by third parties not in contractual privity with the defendant, limiting the unpredictable and unlimited nature of economic damages.[13] *See Ultramares*, 255 N.Y. at 179, 174

---

**13.** The decision in *Ultramares* was also guided by its view of the role of the certified public accountant and the third party's expectation. According to the *Ultramares* court, expanding the duty of an accountant to include those who, although not clients, use or rely on the accountant's work product is not necessary to protect the incidental third parties. It reasoned that it is doubtful that the average business men receiving a certificate without paying for it and receiving it merely as one among a multitude of possible investors, would look for anything more then legal protection against fraud. *Id.* at 188, 174 N.E. at 448. Indeed, judging from its observation that "public accountants are public only in the sense that their services are offered to any one who chooses to employ them," *id.*, the court apparently believed that the accountant's product is intended only for the benefit of the client. *See* Orlinski, *supra*, 43 DePaul L.Rev. at 874.

That perception of the public role of a CPA may not reflect the current commercial realities. The AICPA's professional standards refer to the public responsibility of auditors:

"A distinguishing mark of a profession is acceptance of its responsibility to the public. The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce. This reliance imposes public interest responsibility on certified public accountants."

(2 AICPA Professional Standards (CCH 1988) § 53.01.). In addition, the United States Supreme Court has recognized the public function of the CPA auditor as a reason to deny work product protection to the auditor's work paper:

"By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watch-

N.E. at 444 (explaining the holding, Judge Cardozo wrote that if third parties were allowed to recover from an accountant for negligence, "a thoughtless slip or blunder . . . [would] expose accountants to liability in an indeterminate amount for an indeterminate time to an indeterminate class"). At the same time, this approach seeks to recognize and give effect to the current commercial reality in which the certified public accountant plays a major role in assuring the reliability of financial statements.

The second approach is the Restatement Approach. *See* Restatement (Second) of Torts, § 552, adopted in 1977. That approach extends liability to members of a limited class of third parties under circumstances prescribed by that § 552, which deals with information negligently supplied for the guidance of others. It provides:

> "(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> "(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

>> '(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

>> '(b) through reliance upon it in a transaction that he intends the information to influence or knows that the

---

dog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust."  ·
*United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826, 836 (1984).

recipient so intends or in a substantially similar transaction.' "

For liability to attach under § 552, the plaintiff must be a member of a limited class to whom the accountant intends to supply the information or to whom the accountant knows the recipient intends to supply it, who suffers loss through reliance on the information for substantially the same purpose as the bona fide client. *See* Orlinski, *supra*, 43 DePaul L.Rev. at 878. Under this approach, not every reasonably foreseeable user of the financial information supplied by the accountant may recover for losses sustained in reliance. An accountant who is retained to conduct an audit and to furnish an opinion for no particular purpose ordinarily undertakes *no duty to third persons.* *See* Restatement (Second) of Torts § 552 cmt. h, illus. 10 (1977). Even though accountants generally know that the financial statements are customarily used in a wide variety of financial transactions by corporations and other businesses and that they likely will be relied upon by lenders, investors, stockholders, creditors and purchasers, for a duty of care to exist, the accountant must be informed that an identified third party or class of third parties will be using the financial statements. *See* Orlinski, *supra*, 43 DePaul L.Rev. at 878–79. Thus, a plaintiff claiming negligent misrepresentation must be the person, or a member of a limited group of persons, for whose benefit and guidance the defendant either intended to supply the information or knew that the recipient of the information intended to supply it. *See id.* at 879. Consequently, an unidentified third party may be able to recover "as long as that third party was a member of an identified class of persons whose reliance the accountant could actually foresee." *Id.* For example, the accountant may be held liable to a third party lender if the accountant is informed by the client that the audit report would be used to obtain a loan, even if the specific lender remains unidentified or the client names one lender and then borrows from another. *See* Restatement (Second) of Torts § 552 cmt. h, illus. 6–7 (1997). Adopted by the majority of courts which have faced the

**678**

issue,[14] this approach has been determined by some of those courts to be most consistent with the policy foundations, *i.e.,* restriction of the person or class of persons entitled to rely on the misrepresentation to those to whom or for whom the misrepresentations were made, underlying the tort of negligent misrepresentation. *See Bily,* 3 Cal.4th at 408, 11 Cal. Rptr.2d 51, 834 P.2d at 769; *Scottish Heritable Trust v. Peat Marwick Main & Co.,* 81 F.3d 606, 612 (5th Cir.1996).

---

**14.** *See Nycal Corporation v. KPMG Peat Marwick LLP.,* 426 Mass. 491, 500, 688 N.E.2d 1368, 1374 (1998); *Boykin v. Arthur Andersen & Co.,* 639 So.2d 504, 509 (Ala.1994); *St. Paul Fire & Marine Insurance Company, v. Touche Ross & Company,* 244 Neb. 408, 424, 507 N.W.2d 275, 285 (1993); *Bily,* 3 Cal.4th 370, 413–14, 11 Cal.Rptr.2d 51, 834 P.2d at 772–73; *Eldred v. McGladrey, Hendrickson & Pullen,* 468 N.W.2d 218, 221 (Iowa 1991); *Federal Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991); *First Florida Bank, N.A. v. Max Mitchell & Co.,* 558 So.2d 9, 14–15 (Fla.1990); *The First National Bank of Bluefield v.Crawford,* 182 W.Va. 107, 110, 386 S.E.2d 310, 313 (1989); *Selden v. Burnett,* 754 P.2d 256 (Alaska 1988); *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 N.C. 200, 214, 367 S.E.2d 609, 617 (1988); *Haberman v. Washington Pub. Power Supply Sys.,* 109 Wash.2d 107, 161, 744 P.2d 1032, 1067 (1987), *modified,* 110 Wash.2d 24, 750 P.2d 254 (1988); *Badische Corp. v. Caylor,* 257 Ga. 131, 132–33, 356 S.E.2d 198, 199–200 (1987); *Christenson v. Commonwealth Land Title Ins. Co.,* 666 P.2d 302 (Utah 1983); *Spherex Inc. v. Alexander Grant & Co.,* 122 N.H. 898, 903, 451 A.2d 1308, 1312 (1982); *Haddon View Inv. Co. v. Coopers & Lybrand,* 70 Ohio St.2d 154, 156–57, 436 N.E.2d 212, 214–15 (1982); *Bonhiver v. Graff,* 311 Minn. 111, 123, 248 N.W.2d 291, 299 (1976); *Kohala Agric. v. Deloitte & Touche,* 86 Hawai'i 301, 322, 949 P.2d 141, 162 (Hawai'i App.1997), *opinion currently on remand; Standard Chartered P.L.C. v. Price Waterhouse,* 190 Ariz. 6, 28, 945 P.2d 317, 339 (Ariz.App.1996), *as corrected after reconsideration denied; ML–Lee Acquisition Fund, L.P. v. Deloitte & Touche,* 320 S.C. 143, 158, 463 S.E.2d 618, 627 (S.C.App.1995), *aff'd in part and rev'd in part on other grounds,* 327 S.C. 238, 489 S.E.2d 470, 472 (1997); *MidAmerican Bank & Trust Co. v. Harrison,* 851 S.W.2d 563, 564–66 (Mo.App.1993); *Law Offices of Lawrence J. Stockler, P.C. v. Rose,* 174 Mich.App. 14, 41, 436 N.W.2d 70, 82 (1989). *See also Bowers v. Allied Inv. Corp.,* 822 F.Supp. 835, 839 (D.Me.1993) (Maine law); *First Nat'l Bank of Commerce v. Monco Agency,* 911 F.2d 1053, 1061 (5th Cir.1990) (Louisiana law); *Ingram Indus. v. Nowicki,* 527 F.Supp. 683, 684 (E.D.Ky.1981) (Kentucky law); *Bunge Corp. v. Eide,* 372 F.Supp. 1058, 1062–63 (D.N.D. 1974) (North Dakota law); *Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85, 91–92 (D.R.I.1968) (Rhode Island law); *Bethlehem Steel Corp. v. Ernst & Whinney,* 822 S.W.2d 592, 595 (Tenn.1991) (adopting test modifying section 552). The Pennsylvania Supreme Court has also adopted Sec-

The third approach is the "foreseeability" approach, under which accountants are liable to third parties in the same way that any other tortfeasor would be. *See* Howard B. Wiener, *Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation*, 20 San Diego L.Rev. 233 (1983). Accordingly, an accountant who prepares an audit report is liable to a third party for negligent misrepresentation if it is reasonably foreseeable that such third party might obtain, and rely on, the audit report. *See Touche Ross & Co. v. Commercial Union Ins. Co.*, 514 So.2d 315, 322 (Miss.1987). This is an expansive view of accountant liability and, thus, it has been adopted in only a few states, *see, e.g., Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis.2d 376, 385, 335 N.W.2d 361, 365 (1983); *Touche Ross & Co.*, 514 So.2d at 318; *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 348, 461 A.2d 138, 151 (1983); *First Nat'l Bank v. Monco Agency, Inc.*, 911 F.2d 1053, 1058–59 (5th Cir.1990), some of which have retreated from it. *See Bily*, 3 Cal.4th at 392, 409, 11 Cal.Rptr.2d 51, 834 P.2d at 757, 769; *Petrillo v. Bachenberg*, 139 N.J. 472, 485, 655 A.2d 1354, 1360 (1995) (noting that New Jersey has statutorily [15] changed

tion 552 of the Restatement of Torts. *See Rempel v. Nationwide Life Ins. Co.*, 471 Pa. 404, 408, 370 A.2d 366, 367 (1977).

**15.** The New Jersey statute, N.J. Stat. § 2A:53A–25 (L.1995, 2000), provides:

"b. Notwithstanding the provisions of any other law, no accountant shall be liable for damages for negligence arising out of and in the course of rendering any professional accounting service unless:

'(1) The claimant against the accountant was the accountant's client; or

'(2) The accountant:

'(a) knew at the time of the engagement by the client, or agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant;

'(b) knew that the claimant intended to rely upon the professional accounting service in connection with that specified transaction; and

'(c) directly expressed to the claimant, by words or conduct, the accountant's understanding of the claimant's intended reliance on the professional accounting service; or

its foreseeability rule for accountants to a more restrictive test).

The policy goals underlying this approach were explained by Justice Weiner, as follows:

"Accountant liability based on foreseeable injury would serve the dual functions of compensation for injury and deterrence of negligent conduct. Moreover, it is a just and rational judicial policy that the same criteria govern the imposition of negligent liability, regardless of the context in which it arises. The accountant, the investor, and the general public will in the long run benefit when the liability of the certified public accountant for negligent misrepresentation is measured by the foreseeability standard."

Weiner, *supra,* 20 San Diego L.Rev. at 260 (1983). *H. Rosenblum, Inc. v. Adler, supra,* 93 N.J. 324, 461 A.2d 138 (1983), presented another rationale for expansive accountant liability. The *Rosenblum* court held that the "auditor's function has expanded from that of a watchdog for management to an independent evaluator of the adequacy and fairness of financial statements issued by management to stockholders, creditors and others." *Id.* at 346, 461 A.2d at 149. In emphasizing the potential deterring effect of the expanded liability rule on the conduct and cost of audits, the court opined that, by imposing a duty of care to foreseeable users of the audit, accountants would "engage in more thorough reviews," which, in turn, should reduce the number of negligence claims against auditors. *Id.* at 350, 461 A.2d at 152.

## B.

The question we now must answer is which, if any, of the approaches most closely reflects the policy concerns in, and at the heart of, our cases. The Court of Special Appeals adopted the *Credit Alliance* formulation of the *Ultramares* approach,

---

'(3) In the case of a bank claimant, the accountant acknowledged the bank's intended reliance on the professional accounting service and the client's knowledge of that reliance in a written communication.' "

including the test that case enunciated to determine whether a given relationship, admittedly not one of privity, is the equivalent of privity.  It did so only after satisfying itself that "while these criteria [prescribed by the test] permit some flexibility in the application of the doctrine of privity to accountants' liability, they do not represent a departure from the principles articulated in *Ultramares, Glanzer,* and *White,* [on which we previously have relied,] but rather, they are intended to preserve the wisdom and policy set forth therein." *Credit Alliance,* 65 N.Y.2d at 551, 493 N.Y.S.2d 435, 483 N.E.2d at 118.  This was accomplished by analyzing the cases on which *Credit Alliance* relied—*Glanzer, supra, Ultramares, supra, White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977),—the companion case to *Credit Alliance, European American Bank & Trust Co. v. Strauhs & Kaye,* 104 A.D.2d 1063, 480 N.Y.S.2d 299 (1984) and *Security Pacific Business Credit, Inc., v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992), decided subsequently.

The petitioner does not quarrel with the intermediate appellate court's holding insofar as it requires proof of privity or its equivalent to establish an accounting malpractice claim.  As it sees it,

> "[t]he intermediate court erred … in accepting an accountant's knowledge of a third-party's reliance on the accountant's work product as the legal equivalent of privity.  Knowledge that the plaintiff is relying on one's work product is significant only in that it establishes that the plaintiff's harm was foreseeable.  While other jurisdictions have adopted a foreseeability standard in assessing tort liability, this Court has consistently held that the duty to avoid economic harm cannot be predicated on foreseeability alone.  There must be an intimate nexus between the parties."

We agree with the Court of Special Appeals.  The reasons lie in a fuller analysis of the New York line of cases.[16]

---

16.  Some commentators, *see e.g., Bily,* 3 Cal.4th at 388, 11 Cal.Rptr.2d 51, 834 P.2d at 754–55, have stated that the 'linking conduct' require-

## C.

The concern caused by holding defendants liable for negligence and negligent misrepresentation to parties with whom they have no contractual relationship, where the only damages are economic, is reflected in the case law comprising the *Ultramares* doctrine. In *Glanzer, supra*, 233 N.Y. at 237–38, 135 N.E. at 275, the plaintiffs purchased beans from a merchant, the price of which was to be determined by their weight. The buyers received a copy of the certified weight sheet that was prepared by public weighers, who weighed the bags upon the seller's request. *Id.* Upon learning that the actual weight was less than that amount specified in the certified weight sheet, the purchasers sued the public weighers. Although the plaintiffs had no contract with the weigher, the court affirmed a judgment in favor of the plaintiffs, holding that they were the known and intended beneficiaries of the contract between the seller and the weigher, and, therefore, a beneficiary of the duty owed by the weigher. *See id.* at 238–39, 135 N.E. at 275–76. It reasoned:

"We think the law imposes a duty toward buyer as well as seller in the situation here disclosed. The plaintiffs' use of the certificates was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers, to the weighers' knowledge, was the end and aim of the transaction. Bech, Van Siclen & Co. or-

---

ment of *Credit Alliance* is what distinguishes the privity approach from the Restatement approach. Clearly, the Restatement's imposition on accountants of a duty of care for negligence, but limited to a definable group of persons with respect to whom the defendant has actual knowledge that they would rely on a given transaction is substantially similar to the *Credit Alliance's* third requirement of linking conduct evincing the accountant's understanding of the plaintiff's reliance. Indeed, if, as the court in *Huang v. Sentinel Gov't. Securities*, 709 F.Supp. 1290, 1298 (S.D.N.Y.1989) indicated with respect to the 'linking conduct' requirement, the touchstone of the inquiry "is not ... formal direct communication, but rather some link of the defendant to plaintiff which evinces defendant's understanding of plaintiff's reliance, then no distinction may exist between the two." *Security Pacific Business Credit, Inc. v. Peat, Marwick Main & Co.*, 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992), as we shall see, has interpreted that requirement more restrictively, however.

dered, but Glanzer Brothers were to use. The defendants held themselves out to the public as skilled and careful in their calling. They knew that the beans had been sold, and that on the faith of their certificate payment would be made. They sent a copy to the plaintiffs for the very purpose of inducing action. All this they admit. In such circumstances, assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed. We do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractural. Given the contract and the relation, the duty is imposed by law."

*Id.* The court also observed, "[o]ne who follows a common calling may come under a duty to another whom he serves, though a third may give the order or make the payment," citing as examples, the surgeon who unskillfully sets the wounded arm of a child, for which the child's father is obligated to pay and a bailee who carelessly keeps goods belonging to one party, but delivered by another. *Id.* at 239, 135 N.E. at 276. Just as significant, however, if not more so, the court recognized the existence of decisions holding lawyers not liable to third parties, "whom [they] did not mean to serve," for supplying certificates of title to clients, *id.* at 240, 135 N.E. at 276, but it contrasted those decisions with others in which the searcher of a title who prepares an abstract at the order of a client and delivers it to another to induce action on the faith of it, concluding, "constantly the bounds of duty are enlarged by knowledge of a prospective use." [17] *Id.* at 240, 135 N.E. at 276, *citing*, among other cases, *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 393, 111 N.E. 1050, 1053–54 (1916). In summary, the court stated:

---

**17.** Alternatively, the court offered an analysis based on contract. *See Glanzer v. Shepard*, 233 N.Y. 236, 241, 135 N.E. 275, 277 (1922). The court observed, in that regard however, "[t]hese other methods of approach arrive at the same goal, though the paths may seem at times to be artificial or circuitous." *Id.*

"The defendants, acting, not casually nor as mere servants, but in pursuit of an independent calling weighed and certified at the order of one with the very end and aim of shaping the conduct of another. Diligence was owing, not only to him who ordered, but to him also who relied." *Glanzer*, at 242, 135 N.E. at 277.

While *Glanzer* may support the trend toward abandoning the strict adherence to the requirement of privity, so that not only those with a contractual relationship may sue for negligence or negligent misrepresentation, it also clearly recognizes that a defendant's knowledge of a third party's reliance on the defendant's action may be important in the determination of whether that defendant owes that party a duty of care.

*Ultramares* is not to the contrary. There, the plaintiff was a creditor of the client of the defendant accountant, who, relying on the balance sheet prepared by the defendant, loaned the client money. Although reflecting that, generally, the accountant was aware that the balance sheets would be shown to others, the facts do not indicate that it was aware of the transaction between its client and the plaintiff, either before or after it was consummated, or that it was advised of the specific purpose for which the certified balance sheet was desired. It is true, of course, that the court refused the plaintiff's invitation to impose a duty of care for negligence, on the part of accountants, to the creditors and investors to whom its client may exhibit its work product, and distinguished *Glanzer*, at least in part, as resting on a contractual foundation, that "the service rendered by the defendant in *Glanzer v. Shepard* was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee." *Id.* at 183, 174 N.E. at 446. But it is also true that it determined that, despite "[t]he range of transactions in which a certificate of audit might be expected to play a part was as indefinite and wide as the possibilities of the business that was mirrored in the summary," *id.* at 174, 174 N.E. at 442, the plaintiff's claim was based on its being simply a member of the public, one of "the indeterminate class of persons who, presently or in the

future, might deal with [the defendant] in reliance on the audit." *Id.* at 183, 174 N.E. at 446. Indeed, while the court acknowledged it was intended that, in the usual course of business the balance sheet, when certified, would be exhibited to banks, creditors, stockholders and others "according to the needs of the occasion, as the basis of financial dealings," it pointed out that "[n]othing was said as to the persons to whom [copies] would be shown or the extent or number of the transactions in which they would be used." *Id.* at 174, 174 N.E. at 442. And "there was no mention of the plaintiff ... which till then had never made advances to the [accountant's client]." *Id.*

*Ultramares,* in distinguishing *Glanzer,* gave greater emphasis to the contractual analysis by which the *Glanzer* court indicated, albeit with circuitousness, the case could be explained. That explanation of the distinction between the cases was also the focus of *Jacques.* Thus, our reference in *Jacques,* 307 Md. at 536, 515 A.2d at 760, to "the contractual relation" in discussing *Ultramares* may suggest that, in order to find a duty, there must be the presence or absence of a contractual relationship. As we have seen, however, the relationship between the plaintiffs and the defendant in *Glanzer* was such that the defendant knew both the purpose for which its work product was to be used—to set the amount of payment due—and if not the identity of the final user, the specific class of persons who could and would rely on that work product. That knowledge needs to be contrasted with that possessed by the defendant in *Ultramares,* who knew only generally that the information it provided would be relied upon by others. Thus, given the policy objective, expressed in *Ultramares,* limiting the indeterminate class of prospective plaintiffs who may incidentally rely on the audit prepared by the defendant, to a smaller class, predictable as to its use, and well defined, at least as to the class affected, as of the time of the misrepresentation, a crucial factor distinguishing the *Ultramares* and *Glanzer* cases is the extent to which the defendants had knowledge of the purpose for which the results of

their contractual undertaking would be used and the identity, or class, of those who would use, and thus rely on, it.

Underlying the *Ultramares'* analysis is the notion that it is unfair, extreme, and out of proportion, to subject a defendant to negligence liability, without limitation, for which there has been only economic damages suffered by third parties, with whom that defendant has no meaningful relationship:

> "If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences."

*Id.* at 179, 174 N.E. at 444. Moreover,

> " '[e]very one making a promise having the quality of a contract will be under a duty to the promisee by virtue of the promise, but under another duty, apart from contract, to an indefinite number of potential beneficiaries when performance has begun. The assumption of one relation will mean involuntary assumption of a series of new relations, inescapably hooked together.' "

*Id.* at 189, 174 N.E. at 448, *quoting Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 168, 159 N.E. 896, 899 (1928). And the indeterminate or general nature of the beneficiaries of a promise affect the remedy that is available, even when there is a trend away from the strict enforcement of privity:

> "Even in the [field of contract law] ... the remedy is narrower where the beneficiaries of the promise are indeterminate or general. Something more must then appear than an intention that the promise shall redound to the benefit of the public or to that of a class of indefinite extension. The promise must be such as to 'bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost.' "

*Id.* at 181, 174 N.E. at 445, *quoting Moch Co. v. Rensselaer Water Co.*, 247 N.Y. at 164, 159 N.E. at 897.

No such indeterminate or general beneficiaries were involved in *Glanzer*, rather known and foreseeable ones:

"Here was something more than the rendition of a service in the expectation that the one who ordered the certificate would use it thereafter in the operation of his business as occasion might require. Here was a case where the transmission of the certificate to another was not merely one possibility among many but the 'end and aim of the transaction,' as certain and immediate and deliberately willed as if a husband were to order a gown to be delivered to his wife, or a telegraph company, contracting with the sender of a message, were to telegraph it wrongly to the damage of the person expected to receive it ... The bond was so close as to approach that of privity, if not completely one with it. Not so in the case at hand. No one would be likely to urge that there was a contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants now before us to the indeterminate class of persons who, presently or in the future, might deal with the Stern company in reliance on the audit."

*Id.* at 182–83, 174 N.E. at 445–46.

Thus, in *Glanzer* the plaintiffs' identity, or at least the class in which they belonged, and that they were going to use, and therefore rely on, the information, was actually known to the defendant, while in *Ultramares*, other than as a member of the public, the defendant had no relationship at all with the plaintiff that provided the defendant with any information bearing on its liability for negligence. In that regard, it is important to note that the requirement of "contractual relation, or even one approaching it," *Ultramares, supra* at 183, 174 N.E. at 446, is, like being the "end and aim of the transaction," *Glanzer, supra* at 238, 135 N.E. at 275, a predictor of liability and its magnitude, the importance of both of which was recognized by the *Ultramares* court in its discus-

sion of *International Products Co. v. Erie,* 244 N.Y. 331, 155
N.E. 662 (1927):

> "Here was a determinate relation, that of bailor and bailee,
> either present or prospective, with peculiar opportunity for
> knowledge on the part of the bailee as to the subject-matter
> of the statement and with continuing duty to correct it if
> erroneous.... There is a class of cases 'where a person
> within whose special province it lay to know a particular
> fact, has given an erroneous answer to an inquiry made with
> regard to it by a person desirous of ascertaining the fact for
> the purpose of determining his course accordingly, and has
> been held bound to make good the assurance he has giv-
> en.' "

*Ultramares, supra* at 183–84, 174 N.E. at 446, *quoting* Hersc-
hell, L.C., in *Derry v. Peek,* [L.R.] 14 A.C. 337, 360.

In subsequent cases, the New York Court of Appeals un-
equivocally stated the policy underpinnings of, and cleared up
the ambiguity surrounding, the *Ultramares* case. In *White v.
Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315
(1977), the issue presented was "whether accountants retained
by a limited partnership to perform auditing and tax return
services may be held responsible to an identifiable group of
limited partners for negligence in the execution of those
professional services." *Id.* at 358, 401 N.Y.S.2d 474, 372
N.E.2d at 317. In that case, a limited partnership was
formed, stating its purpose to be to serve "as a hedge fund
through which the funds of its Partners may be utilized in
investing and trading in marketable securities and rights and
options relating thereto." *Id.* The agreement required that an
audit be performed, for the performance of which and to
prepare the partnership tax returns, the defendant accoun-
tants were retained. *Id.* at 359, 401 N.Y.S.2d 474, 372 N.E.2d
at 317. In addition to the audit requirement, the agreement
prescribed the capital contribution of the limited partners,
prohibited its withdrawal except as prescribed and provided
that "proper and complete books of account shall be kept and
shall be open to inspection by any of the partners." *Id.* The
court held, "at least on the facts here, an accountant's liability

may be so imposed." *Id.* at 358, 401 N.Y.S.2d 474, 372 N.E.2d at 317.

In reaching its decision, the court contrasted the facts in its case with those in *Ultramares*. It noted that *"Ultramares . . .* presented a noticeably different picture than that here, since there involved was an 'indeterminate class of persons who, presently or in the future, might deal with the (debtor-promisee) in reliance on the audit.' " *Id.* at 361, 401 N.Y.S.2d 474, 372 N.E.2d at 318, *quoting Ultramares*, 255 N.Y. at 183, 174 N.E. at 446. By contrast, the court pointed out:

"Here, the services of the accountant were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit and made up of certain components. . . . The instant situation did not involve prospective limited partners, unknown at the time and who might be induced to join, but rather actual limited partners, fixed and determined. Here, accountant Andersen was retained to perform an audit and prepare the tax returns of Associates, known to be a limited partnership, and the accountant must have been aware that a limited partner would necessarily rely on or make use of the audit and tax returns of the partnership, or at least constituents of them, in order to properly prepare his or her own tax returns. This was within the contemplation of the parties to the accounting retainer. In such circumstances, assumption of the task of auditing and preparing the returns was the assumption of a duty to audit and prepare carefully for the benefit of those in the fixed, definable and contemplated group whose conduct was to be governed, since, given the contract and the relation, the duty is imposed by law and it is not necessary to state the duty in terms of contract or privity. . . . "

*Id.* at 361–62, 401 N.Y.S.2d 474, 372 N.E.2d at 318–19. The court stated further that "[t]his plaintiff seeks redress, not as a mere member of the public, but as one of a settled and particularized class among the members of which the report would be circulated for the specific purpose of fulfilling the

limited partnership agreed upon arrangement." *Id.* at 363, 401 N.Y.S.2d 474, 372 N.E.2d at 320.

Since *Credit Alliance,* it is now clear that accountants may be held liable for negligence to non-contractual parties when they are aware that the financial reports they prepare are to be used for a particular purpose or purposes, that a known party or parties are intended to rely on those reports for that purpose or purposes and they have a relationship with that party that indicates that they understand that party's reliance. *Id.* at 551, 493 N.Y.S.2d 435, 483 N.E.2d at 118. These "criteria" were gleaned, the court said, from "examination of *Ultramares* and *Glanzer* and [the court's] recent affirmation of their holdings in *White.*" *Id.* Moreover, the court made clear that:

> "While these criteria permit some flexibility in the application of the doctrine of privity to accountants' liability, they do not represent a departure from the principled articulated in *Ultramares, Glanzer* and *White,* but, rather they are intended to preserve the wisdom and policy set forth therein."

*Id.*

*Credit Alliance* has clarified the ambiguity surrounding the nature of the relationship between the plaintiff and the defendant sufficient to constitute the required nexus that approaches privity under *Ultramares* and *Glanzer.* Clearly, it must be such that would allow the defendant to predict its liability exposure. Nevertheless, one of the criteria remains unclear, the nature of the link between the accountant and the non-contractual plaintiff required to satisfy the *Credit Alliance* test. That was the focus of *Security Pacific Bus. Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992).

In that case, the plaintiff had loaned a client of the accountant money on a line of credit. When the client defaulted, it sued the accountant, with whom it had no contractual or other direct business relationship, alleging negligent over-valuation

of the client's accounts receivable and merchandise inventory, reflected in an unqualified audit opinion and financial statements, on which the plaintiff relied in making a part of the loan. To establish the third of the *Credit Alliance* criteria, the plaintiff relied on a telephone call from its vice-president to the defendant's audit partner during, and with respect to, the applicable audit and the audit work papers the client supplied the plaintiff. Applying the *Credit Alliance* test,[18] a divided Court of Appeals held that the single telephone call did not suffice to allege the necessary relationship. *See Security Pacific, supra* at 704, 586 N.Y.S.2d 87, 597 N.E.2d at 1085. The court reasoned that the audit partner's responses to the plaintiff's inquiries,

> "placed after the audit field work was completed were, viewed in the most favorable light plaintiff places upon them, 'limited to generalities that nothing untoward had been uncovered in the course of the audit and that an unqualified opinion would issue, certifying the tentative draft which plaintiff had received from [the client] itself.' (*Security Pac. Business Credit v. Peat Marwick Main & Co.*, 165 A.D.2d 622, 626, [569 N.Y.S.2d 57] ). SPBC's efforts to elevate these facts to the critical rank and linking relationship akin to privity, as our precedents require, are unavailing. SPBC cannot unilaterally create such an extraordinary obligation, imposing negligence liability of sig-

---

**18.** After quoting the *Credit Alliance* test, the court summarized it as follows:

> "The indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or bond with the once-removed accountants 'sufficiently approaching privity' based on 'some conduct on the part of the accountants.' "

*Security Pacific Business Credit, Inc. v. Marwick Main & Co.*, 79 N.Y.2d 695, 702-03, 586 N.Y.S.2d 87, 597 N.E.2d 1080, 1083 (1992) (internal citations omitted). The court made clear that the only one of the *Credit Alliance* criteria at issue in the case was the third, the accountant's linking conduct. *Id.* at 709, 586 N.Y.S.2d 87, 597 N.E.2d at 1088 (dissenting opinion).

nificant commercial dimension and consequences by merely interposing and announcing its reliance in this fashion." *Id.* at 705, 586 N.Y.S.2d 87, 597 N.E.2d at 1085.[19]

**D.**

As indicated, we agree with the intermediate appellate court, that the appropriate analysis is that enunciated in *Credit Alliance,* elucidating the *Ultramares* doctrine. This Court having frequently relied on the New York line of cases to resolve and explain a defendant's liability, or lack thereof, to a third party, with whom the defendant is not in contractual privity, it is fitting that this Court continue that reliance in resolving an issue of accountant liability to third parties, especially since that is the context in which the *Ultramares* case was decided.

■ Under the *Credit Alliance* formulation of the test, the required linking conduct, while that of the accountant, must be such that evinces the accountant's knowledge of the plaintiff's reliance, and, thus, its liability exposure. Nothing in that test limits the source of the evidence bearing on the conduct of the accountant or prescribes that the conduct exceed a minimum level. Nor can there be read into *Credit Alliance* a requirement that the accountant "either directly convey the audit report to the third party or otherwise act in some manner specifically calculated to induce reliance on the report." *Bily,* 3 Cal.4th at 388, 11 Cal.Rptr.2d 51, 834 P.2d at 755. The *Credit Alliance* test calls for the production of evidence of "some conduct on the part of the accountants linking them to

---

**19.** The dissenting opinion in *Security Pacific,* agreeing with the interpretation given *Credit Alliance* by other courts, *see First Nat'l. Bank of Commerce v. Monco Agency,* 911 F.2d 1053, 1059 (5th Cir.1990) (requiring that the accountants manifest conduct underscoring their understanding of a particular non-client's reliance upon the work product); *Huang v. Sentinel Gov't. Securities,* 709 F.Supp. 1290, 1298 (S.D.N.Y. 1989) (determining that touchstone of the inquiry "is not ... formal direct communication, but rather some link of the 'defendant to plaintiff which evinces defendant's understanding or plaintiff's reliance' ") (internal citation omitted), opined that "[t]he language of the *Credit Alliance* opinion suggests that what is called for is an evidentiary showing of some communication or contacts demonstrating the accountant's awareness of the third party's reliance." *Security Pacific,* 79 N.Y.2d at 708, 586 N.Y.S.2d 87, 597 N.E.2d at 1087.

that party or parties, which evinces the accountant's understanding of that party's reliance." *Credit Alliance, supra* at 551, 493 N.Y.S.2d 435, 483 N.E.2d at 110. There was, to be sure, an abundance of conduct alleged in *Credit Alliance;* however, that conduct alleged does not, and the Court did not purport to, set the threshold for future cases. All that is required is that the trier of fact could find that the evidence suffices to apprise the defendant of the elements of the *Credit Alliance* test, *i.e.,* the purpose for which its work product is to be used, who is intended at the time of the engagement to use it for that purpose, see *Jones v. Hyatt Ins. Agency, Inc.,* 356 Md. 639, 658–59, 741 A.2d 1099, 1108–09 (1999), and some connection with that party that is the equivalent of privity, such as knowledge of that party's reliance.

■ Applying the *Credit Alliance* analysis to the facts *sub judice* produces a clear result, as the Court of Special Appeals held, that the liability of the petitioner to the respondents is a matter for the trier of fact; and the intermediate appellate court correctly reversed the trial court's grant of summary judgment in favor of the petitioner.

The affidavit of George Katz delineated the relationship between the petitioner and the respondents. It stressed that George Katz met face to face with a representative of the petitioner and his son on several occasions to look over the audits and reports of Magnetics prior to making loans to, or securing loans for, Magnetics, and that WS & B personnel knew that the Katzses had relied on information supplied by WS & B in deciding to lend monies to, or securing loans for, Magnetics. In fact, as relates to the $425,000 loan, he stated that he met with a Mr. Tracey of the petitioner for the express purpose of discussing the loan. During that meeting, according to the affidavit, Mr. Katz was given a copy of the Magnetics, Inc.'s cash flow analysis and a projected profit and loss statement for the coming year. He also indicated that he was given a copy of the audit for Magnetics by the petitioner, whom he advised that he would consider lending money to Magnetics, dependent on Magnetics' financial condition, as

reflected in the information with which he was provided by the petitioner, including financial reports the petitioner prepared for Magnetics.

The Court of Special Appeals concluded:

"Assuming the truth of these facts, WS & B was aware that the financial report was going to be used for a particular purpose, i.e., to help Mr. Katz decide whether to make the $425, 000 loan to Magnetics. Moreover, WS & B knew that it was Mr. Katz who was going to rely on the financial report, because he informed Mr. Tracey of this fact at a face-to-face meeting. These points address *Credit Alliance* factors one and two.

"Finally, if Mr. Katz's affidavit is credited, there was sufficient conduct on the part of WS & B, through Mr. Tracey, to meet the 'linking conduct,' which is factor three of the Credit Alliance test. Mr. Tracey met with Mr. Katz to discuss Magnetics' financial condition in order for Mr. Katz to determine whether to 'lend money to Magnetics.' Moreover, Mr. Tracey gave a copy of the 1989 audit *directly* to Mr. Katz. These actions on the part of Mr. Tracey could be construed by a jury as demonstrating Mr. Tracey's knowledge that Mr. Katz intended to rely on WS & B's financial representations in the 1989 audit. Based on the facts set forth in Mr. Katz's affidavit, a dispute of material fact was presented as to the $425,000 loan."

We agree with that analysis and, so, we affirm.

JUDGMENT AFFIRMED, WITH COSTS.

WILNER, Judge, concurring.

I concur in the result reach by the Court. I would reach that result, however, by using the approach set forth in § 552 of the RESTATEMENT (SECOND) OF TORTS, rather than by tying ourselves to one 1985 case from New York.

As Chief Judge Bell points out, the Restatement approach has been adopted in 28 States and clearly represents the majority sentiment throughout the country. Accounting firms, increasingly, are national, or at least regional, in their

operations, and it seems to me wiser to choose consistency with that majority view. We gain little by tying ourselves to the separate view of one State. The fact patterns that arise in this area obviously vary, and all concerned—the accounting profession, those who insure accountants against malpractice claims, those who deal with accountants, and the legal community that either advises accountants or becomes involved in malpractice claims—would be better served by having that larger body of case law, that is followed in most of the rest of the country, as guidance. The Restatement view, moreover, is a reasonable one. It limits the accountant's liability for professional negligence to the accountant's client and to those third parties to whom the accountant either intends to supply the information or actually knows the client intends to supply it. That limited extension of liability is entirely appropriate.